# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                           **Case No. 21-CR-233**

DAVID BRAEGER,

        Defendant.

# RECOMMENDATION AND ORDER

On November 16, 2021, the grand jury in this district returned a ten-count indictment against David Braeger. (ECF No. 1.) The indictment charges Braeger with three counts of bank fraud (counts 1-3), four counts of wire fraud (counts 4, 6-8), one count of mail fraud (count 5), and two counts of engaging in unlawful monetary transactions (counts 9-10). (ECF No. 1.) On November 1, 2022, Braeger filed six pretrial motions: (1) motion to dismiss counts 1-3 for failure to state a claim (ECF No. 32); (2) motion to dismiss counts 1-3 as multiplicitous (ECF No. 35); (3) motion to strike surplusage (ECF No. 31); (4) motion to dismiss count 4 for failure to state a claim (ECF No. 36); (5) motion to sever counts 5-10 (ECF No. 33); and (6) motion for bill of particulars

(ECF No. 34). The government has responded (ECF No. 37), and Braeger has replied (ECF No. 44).

## 1.     Indictment's Allegations

To the extent Braeger's pretrial motions challenge the indictment's legal sufficiency, this court accepts its allegations as true. *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009).

According to the indictment, Braeger organized and carried out two separate schemes to defraud. The "IEF scheme" began in September 2016 when Braeger, in the name of the "International Energy Fund, LLC" (IEF), opened a business checking account with BMO Harris Bank (the "IEF business account"). (ECF No. 1 at ¶ 2.) Braeger purported to form IEF to invest in a geothermal energy plant in Uganda. (ECF No. 1 at ¶ 4.) In setting up the IEF business account, Braeger represented to BMO Harris Bank that no funds deposited in the account would be for his personal use. (ECF No. 1 at ¶ 3.) Braeger then sought to obtain funds to deposit into the IEF business account. To that end, he distributed private placement memoranda (PPM) to potential investors with false representations about how he would use their funds for the specified Ugandan energy plant. (ECF No. 1 at ¶¶ 5-6.) A potential investor, J.P., received Braeger's PPM and provided Braeger with a $100,000 check payable to IEF for investment in the Ugandan energy plant. (ECF No. 1 at ¶¶ 5-7.) Braeger deposited J.P.'s check into the IEF business account. (ECF No. 1 at ¶ 8.)

Counts 1-4 all relate to the IEF scheme. Count 1 charges Braeger with bank fraud for transferring from the IEF business account into a passthrough bank account $10,000 of J.P.'s investment and then withdrawing and spending the $10,000 on "personal expenses." (ECF No. 1 at ¶¶ 12-14.) Count 2 charges Braeger with another count of bank fraud for withdrawing $21,538.99 from the IEF business account and using the money to buy himself a car. (ECF No. 1 at ¶ 16.) Count 3 charges Braeger with a final count of bank fraud for drawing on the IEF business account to write a check for $3,000 and using it to pay his legal fees. (ECF No. 1 at ¶ 18.) Count 4 charges Braeger with wire fraud for sending an email in August 2018 to J.P. under the guise of an investment status update, but with the intention of keeping the scheme going by assuring J.P. that his investment was safe. (ECF No. 1 at ¶ 20.)

The "Blue Star scheme" began in August 2017 and involved the "Blue Star Automotive Fund, L.P.," which Braeger "ostensibly formed as an investment vehicle to make loans to an Arizona-based auto dealer doing business as Onyx Motorsports." (ECF No. 1 at ¶ 22.) As he did with the IEF scheme, Braeger sought investments in his Blue Star scheme by distributing to potential investors PPMs containing false representations about Blue Star and how investments in Blue Star would be used. (ECF No. 1 at ¶ 23.) And, as with the IEF scheme, Braeger succeeded in persuading individuals to invest in Blue Star. (ECF No. 1 at ¶ 23.)

Instead of using investors' funds in the manner represented in the Blue Star PPMs, Braeger used them to pay off other investors under the guise of legitimate investment returns—often referred to as "Ponzi-scheme payments"—to keep the investors from discovering his fraud. (ECF No. 1 at ¶ 24.) And, as with the IEF scheme, he also used Blue Star investments for personal purposes, such as utilities, meals, retail shopping, and cars. (ECF No. 1 at ¶ 24.) He further used investments to fund separate business ventures unrelated to the Blue Star PPM proposals—for example, for the Silver Spring House restaurant in Glendale, Wisconsin. (ECF No. 1 at ¶ 24.)

Counts 5-10 of the indictment relate to the Blue Star scheme. Count 5 charges Braeger with mail fraud for receiving an investment check for $100,000 via mail from an investor, R.G. (ECF No. 1 at ¶ 33.) Count 6 charges Braeger with wire fraud for using $66,500 of R.G.'s check as a Ponzi-type payment to a prior investor in one of Braeger's business ventures. (ECF No. 1 at ¶¶ 35-36.) Counts 7 and 8 charge Braeger with wire fraud for making two separate withdrawals from a BMO Harris bank account. (ECF No. 1 at ¶¶ 38-39.) And the final two counts in the indictment, counts 9 and 10, charge Braeger with using Blue Star investors' money to buy two cars, each for an amount in excess of $10,000. (ECF No. 1 at ¶¶ 42-45.)

**2. Motions to Dismiss Counts 1, 2, and 3**

Braeger moves to dismiss counts 1-3 of the indictment (ECF Nos. 32, 35), which allege that he knowingly executed a scheme to obtain bank funds by means of fraud in

violation of 18 U.S.C. § 1344(2) (ECF No. 1 at ¶¶ 1-18). Braeger has filed two motions to dismiss the three bank fraud counts. In one motion he argues that the indictment fails to state a claim for bank fraud because it does not allege an essential element of bank fraud under § 1344(2). (ECF No. 32.) In the other motion he argues that the bank fraud charges should be dismissed on the ground that the counts are multiplicitous. (ECF No. 35.)

### 2.1.    Failure to State a Claim (ECF No. 32)

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is constitutionally sufficient if it "(1) states all the elements of the crime charged; (2) informs the defendant of the nature of the charge, enabling the defendant to prepare a defense; and (3) enables the defendant to plead the judgment as a bar to later prosecution of the same offense." *United States v. Abu-Shawish*, 507 F.3d 550, 553 (7th Cir. 2007) (quoting *United States v. Allender*, 62 F.3d 909, 914 (7th Cir. 1995)). Indictments are to be read in a practical manner, as a whole, and "to include facts that are necessarily implied," *United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998), not in a hypertechnical manner, *see United States v. Moore*, 563 F.3d 583, 585 (7th Cir. 2009).

"In determining whether an essential element of the crime has been omitted from the charge, courts will not insist that any particular word or phrase be used. The element may be alleged in any form which substantially states it." *United States v. Harvey*, 484 F.3d 453, 457 (7th Cir. 2007) (ellipses omitted) (quoting *United States v. Weatherspoon*, 581 F.2d

595, 600 (7th Cir. 1978)). "[I]t is not necessary to spell out each element, so long as each element is present in context." *United States v. Westmoreland,* 240 F.3d 618, 633 (7th Cir. 2001) (brackets omitted) (quoting *United States v. Smith*, 223 F.3d 554, 571 (7th Cir. 2000)).

Counts 1-3 of the indictment charge Braeger with violating 18 U.S.C. § 1344(2), which provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
> …
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344(2).

In *Loughrin v. United States*, 573 U.S. 351 (2014), the Supreme Court explained that § 1344(2)'s "'by means of' language requires … that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money." *Id.* at 365. In other words, "it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement"; the government must also satisfy a "relational component" showing that the defendant tried or did get bank property "'by means of' the misrepresentation." *Id.* at 362. This means that "the given result (the 'end') is achieved, at least in part, *through* the specified action." *Id.* at 363 (emphasis in original).

Braeger argues that counts 1-3 should be dismissed because the indictment does not sufficiently establish *Loughrin*'s "by means of" element—that is, that he made a materially false representation to BMO Harris Bank which was "the mechanism naturally inducing" the bank "to part with its money." *Loughrin*, 573 U.S. at 365. Braeger argues his representation to BMO Harris that he would not use funds deposited in the IEF business account for personal use (ECF No. 1 at ¶ 3) cannot satisfy *Loughrin*'s "by means of" requirement because "the indictment does not allege that this specific statement was false or material," nor does it allege that BMO Harris relied on it in releasing funds held in the IEF business account (ECF No. 32 at 7).

The indictment alleges that, when Braeger opened the IEF business account, he represented to BMO Harris that he would not use any funds in the account for his personal use. (ECF No. 1 at ¶¶ 2-3.) And the indictment alleges that J.P. provided Braeger with "a $100,000 check payable to IEF to be invested in the Ugandan energy plant," which check Braeger deposited into the IEF business account. (ECF No. 1 at ¶¶ 7-8.) Counts 1-3 allege that on three occasions Braeger—despite his representation to BMO Harris— withdrew funds from the account to pay for personal expenses. (ECF No. 1 at ¶¶ 14, 16, 18.)

Braeger's representation to BMO Harris is properly construed under *Loughrin* as a "mechanism naturally inducing a bank (or custodian) to part with its money" because it was a necessary step toward the fraudulent withdrawals charged in counts 1-3. *See*

*Loughrin*, 573 U.S. at 365. Without Braeger's false statement to BMO Harris that he would not use funds deposited in the IEF business account for personal use, he would not have been able open a business account with BMO Harris in the name of IEF, he would not have been able to deposit in that account a check made out to IEF, and he would not have been able to make the subsequent withdrawals for personal purposes. Therefore, the "connection" between Braeger's false representation to BMO Harris and the bank's facilitation of Braeger's fraudulent withdrawals is "something more than oblique, indirect, and incidental." *Loughrin*, 573 U.S. at 363 (citations omitted).

Braeger argues that his representation to BMO Harris cannot be the statement that satisfies *Loughrin*'s requirement because the indictment does not explicitly state that Braeger's representation to BMO Harris was "false" or that BMO Harris relied on the statement in releasing funds to Braeger. But the indictment alleges that Braeger used the IEF business account's funds for personal use (ECF No. 1 at ¶¶ 14, 16, 18), clearly indicating that his representation to BMO Harris was false. And while the indictment does not explicitly state that BMO Harris relied on Braeger's representation when it allowed him to make the specific withdrawals alleged in counts 1-3, its reliance on his representation when it allowed him to open the account—without which J.P. could not have deposited a check made out to IEF and Braeger could not have made the fraudulent withdrawals—is clearly implied when the indictment is read practically and "to include facts that are necessarily implied." *Palumbo Bros.*, 145 F.3d at 860.

In sum, the indictment alleges each element of bank fraud under 18 U.S.C. § 1334(2)—including *Loughrin*'s "by means of" element—and provides Braeger with adequate notice of the charges so that he can prepare a defense. As such, counts 1-3 do not fail to state a claim for bank fraud under 18 U.S.C. § 1334(2).

The court will recommend that Braeger's motion to dismiss counts 1-3 for failure to state a claim be denied.

### 2.2.    Multiplicity (ECF No. 35)

Braeger also argues that counts 1-3 should be dismissed because they are multiplicitous. (ECF No. 35.) Multiplicity is the charging of a single offense in more than one count of an indictment. *United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011) (citing *Allender*, 62 F.3d at 912). "Multiplicity in an indictment exposes a defendant to the threat of receiving multiple punishments for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment." *United States v. Starks*, 472 F.3d 466, 469 (7th Cir. 2006).

To determine whether counts are multiplicitous the court examines the applicable criminal statute to identify the allowable "unit of prosecution"—*i.e.*, the minimum amount of activity for which criminal liability attaches. *Allender*, 62 F.3d at 912. In bank fraud cases, each "execution" of the scheme to defraud, rather than a mere act in furtherance of the scheme, constitutes a separate violation of 18 U.S.C. § 1344. *Id.* What separates an execution of a scheme from an act in furtherance of a scheme "depends upon

'the particular facts of each case.'" *See United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir. 1994) (quoting *United States v. Molinaro*, 11 F.3d 853, 860 (9th Cir. 1993)).

"An act is an indictable 'execution' rather than a non-indictable 'act in furtherance' when the act puts the bank at an additional financial risk." *United States v. Ajayi*, 808 F.3d 1113, 1124 (7th Cir. 2015) (citing *Longfellow*, 43 F.3d at 323). Moreover, an execution of a scheme to defraud is "chronologically and substantively independent," where no act "depended on the others for its existence," and "each had its own functions and purpose—they were interrelated only because they involved the same overall scheme." *See id.* (quoting *Molinaro*, 11 F.3d at 860). "A single criminal scheme may have more than one execution." *Ajayi*, 808 F.3d at 1123-24 (citing *United States v. Anderson*, 188 F.3d 886, 889 (7th Cir. 1999)).

Braeger relies on *United States v. Ajayi*, 808 F.3d 1113 (7th Cir. 2015), for his multiplicity argument. (ECF No. 35 at 4-7.) In *Ajayi*, the defendant knowingly deposited a fraudulently altered check into a bank account, which his bank honored, after which the defendant made several withdrawals from the funds that the bank had credited to the fraudulent check. *Id.* at 1123. The defendant was indicted on five counts of bank fraud—one count for making the initial deposit of the fraudulently altered check, and four counts for the four withdrawals. *Id.* The court concluded that the four counts for the four withdrawals were multiplicitous of the count for depositing the altered check because the withdrawals were "entirely dependent on the initial deposit of the fraudulent check,"

each withdrawal "occurred within days of the other," and "the withdrawal of funds did not put the bank at any additional risk." *Ajayi*, 808 F.3d at 1124. The court held that "withdrawals of money credited to an account that is the proceeds of a fraudulent check are not indictable separate executions." *Id.* at 1124 (citation omitted).

In *Ajayi* the defendant committed bank fraud when he deposited the fraudulently altered check; at that point the bank was at financial risk of losing the entire sum it credited to the fraudulent check. *See Ajayi*, 808 F.3d at 1124; *see also United States v. Hord*, 6 F.3d 276, 281 (5th Cir. 1993) ("[W]e have no doubt that [the defendant] making deposits using bogus checks … satisfies the requirements of [§ 1344]."). But J.P.'s $100,000 check was a legitimate check. When Braeger deposited it into the IEF business account, he had not yet committed bank fraud because he had not breached his promise to J.P. about where his $100,000 investment was going, nor his promise to BMO Harris that he would not use funds deposited in the IEF business account for personal purposes. Thus, the bank was not yet at financial risk. *Ajayi*, 808 F.3d at 3d at 1124 ("An act is an indictable 'execution' rather than a non-indictable 'act in furtherance' when the act puts the bank at an additional financial risk." (citing *Longfellow*, 43 F.3d at 323)). Unlike in *Ajayi*, the indictment does not charge Braeger with bank fraud for depositing J.P.'s check into the IEF business account.

Braeger's subsequent withdrawals of funds from the IEF business account for his personal use are what breached Braeger's representation to BMO Harris and put the bank

at financial risk. And the indictment treats those withdrawals as separate executions of Braeger's bank fraud by charging a separate count of bank fraud for each withdrawal. (ECF No. 1 at ¶¶ 14, 16, 18.) That is consistent with how courts have construed executions of bank fraud under similar circumstances. *See, e.g., United States v. Gallant*, 537 F.3d 1202, 1226-27 (10th Cir. 2008) (holding that each transfer of money was a separate execution of bank fraud scheme because the "discrete transfers were ultimately what put BestBank at risk of loss"); *United States v. Mancuso*, 799 F. Supp. 567, 571-72 (E.D.N.C. 1992) ("[E]ach diversion of funds from the bank … constitutes a separate execution of the scheme to defraud the bank."). As such, the three bank fraud counts are not multiplicitous; each count corresponds to a separate execution of bank fraud.

The court will recommend that Braeger's motion to dismiss counts 1-3 as multiplicitous be denied.

### 3. Motion to Strike Paragraphs 3 and 14 as Surplusage (ECF No. 31)

Braeger argues that paragraphs 3 and 14 in the indictment are surplusage and moves to strike them on that basis. Under Federal Rule of Criminal Procedure 7(d), "the court may strike surplusage from the indictment." The court's decision on a Rule 7(d) motion hinges on relevance and prejudice considerations. *United States v. Peters*, 435 F.3d 746, 753 (7th Cir. 2006) ("Surplusage should not be stricken unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." (internal quotations and citations omitted)).

Paragraph 3 of the indictment provides: "When Braeger opened IEF's business account, he represented to BMO Harris Bank that any funds in the account would not be used for personal, consumer, or household use." (ECF No. 1 at ¶ 3.) Paragraph 14 provides: "After Braeger transferred $10,000 from the IEF Business Account to the Private Equity Ventures account, he fraudulently spent the money on personal expenses." (ECF No. 1 at ¶14.)

Because both paragraphs are essential to certain charges in the indictment, neither is surplusage. As discussed above, Braeger's representation to BMO Harris that he would not use funds deposited in the IEF business account for personal use is central to the government's theory of bank fraud. And, as explained in the multiplicity analysis above, paragraph 14's allegation that Braeger spent $10,000 of funds transferred out of the IEF business account on personal expenses is necessary to show that count 1 constitutes a separate execution of bank fraud.

The court will deny Braeger's motion to strike surplusage from the indictment.

### 4.    Motion to Dismiss Count 4 (ECF No. 36)

Braeger moves to dismiss count 4 of the indictment for failure to state a claim. (ECF No. 36.) Count 4 alleges that Braeger committed wire fraud under 18 U.S.C. § 1343 when he knowingly sent an email to J.P. on August 24, 2018, with the intent "to continue the deception of J.P. regarding the status of his investment and reduce the likelihood of jeopardizing the IEF scheme." (ECF No. 1 at ¶ 20.)

Braeger argues that the IEF scheme's background allegations—paragraphs 1-10—outline a bank fraud scheme in which he allegedly sought to acquire property in the custody of the victim, BMO Harris Bank. He argues that the allegations do not allege a wire fraud scheme against J.P. And when he sent the email to J.P., the bank fraud scheme against BMO Harris had been complete for nearly two years. (ECF No. 36 at 7.) "What this all shows," Braeger argues, is that "the indictment attempts to piggyback a belated wire fraud claim onto an already completed bank fraud scheme." (ECF No. 36 at 7.) Because the offenses do not seamlessly overlap, the facts alleged fail to state a claim for wire fraud. (ECF No. 36 at 7-8.)

The government responds that the IEF scheme's background allegations outline an overarching "scheme to defraud," not merely a "bank fraud" scheme. (ECF No. 37 at 4.) And these allegations allege elements and conduct giving rise to both wire and bank fraud charges. (ECF No. 37 at 4.) Specifically, they explain how Braeger "developed the IEF scheme to steal money from J.P. under false and fraudulent pretenses," and, "[a]s part of that scheme, he lied to the bank." (ECF No. 37 at 4.)

The elements of wire fraud under 18 U.S.C. § 1343 are: (1) the defendant knowingly devised or participated in a scheme to defraud; (2) the defendant acted with the intent to defraud; (3) the scheme involved a materially false representation; and (4) the defendant used wire communications. *See* 18 U.S.C. § 1343; Seventh Circuit Pattern Criminal Jury Instructions, at 611, 18 U.S.C. §§ 1341, 1343 (2022 ed.). Of relevance here, under the

"lulling" theory of wire fraud, "mailings and calls which occur after the defendant has obtained the victims' money are" chargeable conduct under § 1343 "if [such communications] facilitate concealment or postpone investigation of the scheme [to defraud]." *United States v. O'Connor*, 874 F.2d 483, 486 (7th Cir. 1989) (quoting *United States v. Eckhardt*, 843 F.2d 989, 994 (7th Cir. 1988)); *see also United States v. Lane*, 474 U.S. 438, 451-52 (1986) (calls made after goods have been fraudulently obtained can further a scheme to defraud by making detection or apprehension less likely).

The indictment sufficiently alleges the requisite elements of a wire fraud charge under the lulling theory. The IEF scheme's background allegations outline how Braeger knowingly devised and executed a scheme to defraud in which J.P.—who relied on the material misrepresentation in the PPM when he decided to invest $100,000 with Braeger—was a victim. (ECF No. 1 at ¶¶ 4-7.) Paragraph 20 adds that Braeger sent an email to J.P., intending to "continue the deception of J.P. regarding the status of his investment and reduce the likelihood of jeopardizing the IEF scheme." (ECF No. 1 at ¶ 20.) Braeger's email fits the "lulling" theory because it was intended to "facilitate concealment or postpone investigation of the scheme [to defraud]." *O'Connor*, 874 F.2d at 486 (quoting *Eckhardt*, 843 F.2d at 994). Thus, the indictment sufficiently alleges all four elements of a wire fraud charge under 18 U.S.C. § 1343.

The court will recommend that Braeger's motion to dismiss count 4 be denied.

**5.      Motion to Sever Counts 5-10 (ECF No. 33)**

Braeger has also filed a motion to sever the counts relating to the Blue Star scheme (counts 5-10) from the counts relating to the IEF scheme (counts 1-4) pursuant to Federal Rule of Criminal Procedure 8(a) or, in the alternative, Federal Rule of Criminal Procedure 14(a). (ECF No. 33.)

**5.1.      Joinder Under Rule 8(a)**

Federal Rule of Criminal Procedure 8(a) permits joinder of offenses if they are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." "Judicial economy and convenience are the chief virtues of joint trials." *United States v. Coleman*, 22 F.3d 126, 132 (7th Cir. 1994). Thus, "there is a strong policy preference in favor of the joinder of qualifying charges and [Rule 8(a)] must be broadly characterized toward that end." *United States v. Alexander*, 135 F.3d 470, 475 (7th Cir. 1998). Courts judge the propriety of joinder based upon the face of the indictment rather than the evidence that supports that indictment. *United States v. Berg*, 714 F.3d 490, 495 (7th Cir. 2013) ("[I]n assessing whether joinder was proper, we look solely to the face of the indictment and not to the evidence adduced later at trial." (quoting *United States v. Lanas*, 324 F.3d 894, 899 (7th Cir. 2003))).

The broadest form of joinder under Rule 8(a) is where the alleged crimes "are of the same or similar character." *Alexander*, 135 F.3d at 476. That is the basis for joinder that the government argues in this case. (ECF No. 37 at 23-25.) The requisites for proper

joinder of charges under this clause are met where the charges "are of like class, although not connected temporally or evidentially." *Coleman*, 22 F.3d at 131. And while the charges must share categorical similarities, they need not have the same statutory basis. *Alexander*, 135 F.3d at 476 (citations omitted).

Braeger points out that the IEF scheme and Blue Star scheme involve different types of fraud, different victims, and that "the Blue Star scheme includes money laundering charges that have no connection or categorical similarity to the bank or wire fraud charges underlying the IEF scheme." (ECF No. 44 at 14.) Given these differences, Braeger argues the government cannot satisfy the "same or similar character" requirement for joinder of the two schemes under Rule 8(a).

Both the Blue Star scheme and IEF scheme charge Braeger with wire fraud (counts 4 and 6-8). However, unlike the Blue Star scheme, the IEF scheme includes bank fraud charges (counts 1-3) and the Blue Star scheme, unlike the IEF scheme, includes a mail fraud charge (Count 5). That the two schemes charge Braeger with different species of fraud does not necessarily mean the schemes are improperly joined. Joinder under Rule 8(a) only requires that charges—or, in this case, schemes to defraud with different charges—share categorical similarities; the charges need not have a statutorily identical basis. *See Alexander*, 135 F.3d at 476. Mail, bank, and wire fraud, despite arising under different statutes, require proof of similar elements—for example, all require proof of an underlying scheme to defraud. *Compare* Seventh Circuit Pattern Criminal Jury

Instructions, at 611, 18 U.S.C. §§ 1341, 1343, (2022 ed.) (listing the elements of mail and wire fraud), *with id.* at 639, 18 U.S.C. § 1344(2) (listing the elements of bank fraud).

Thus, even where two schemes charge a defendant with committing different types of fraud, they might require similar proof such that joinder of the schemes under the same or similar character prong is appropriate. *See, e.g., Alexander*, 135 F.3d at 476 (upholding the joinder of bankruptcy, mail, and mortgage fraud charges where all offenses "involved a materially false representation made with intent to deceive a specified victim"); *United States v. Simmons*, No. 10 CR 820, 2012 WL 12973898, at *2 (N.D. Ill. June 28, 2012) (finding appropriate joinder of two separate schemes involving bankruptcy and wire fraud charges where both schemes "allegedly targeted the same type of victim and operated through the same company"), *aff'd*, 606 F. App'x 848 (7th Cir. 2015).

The two schemes here share a similar design and give rise to the fraud charged in a similar manner. Both schemes, for example, involved an investment vehicle—the IEF scheme had the "International Energy Fund, LLC" and the Blue Star scheme had the "Blue Star Automotive Fund, L.P." (ECF No. 1 at ¶¶ 2, 22.) Further, Braeger in both schemes solicited investments by distributing PPMs containing representations about how investments would be used and how returns would be generated, which representations investors relied on when deciding to invest in the respective schemes. (ECF No. 1 at ¶¶ 1-7, 21-23.) And Braeger, instead of using the investments for the

purposes represented in the PPMs, used the funds for his personal purposes. (ECF No. 1 at ¶¶ 14, 16, 18, 39, 45.)

While his use of investors' funds for his own personal purposes in the Blue Star scheme gave rise to wire fraud charges (counts 7 and 8), in the IEF scheme his use of investors' funds gave rise to bank fraud charges (counts 1-3). Braeger took measures in each scheme to conceal his fraudulent activity to keep the schemes going (ECF No. 1 at ¶¶ 20, 35-36), giving rise to wire fraud in both schemes (counts 4, 6). And while the two schemes—at least as alleged in the indictment—shared no common victims, they did overlap temporally—the IEF scheme occurred from September 2016 to August 2018, and the Blue Star scheme from August 2017 to December 2018. (ECF No. 1 at ¶¶ 1, 21.) Given that mail, bank, and wire fraud require proof of similar elements and that Braeger designed and carried out the two schemes in a similar manner, the fact that the two schemes give rise to different species of fraud is not a sufficient reason to order that the two schemes be severed.

Braeger argues that money laundering under 18 U.S.C. § 1957 is an offense categorically different than mail, bank, and wire fraud because it—in many cases—does not require proof of fraud at all. (ECF No. 33 at 6.) And because money laundering charges are categorically distinct from fraud charges, Braeger argues their inclusion in the Blue Star scheme requires that the two schemes be severed. (ECF No. 33 at 6.) The government argues in response that the inclusion of the money laundering charges in the

Blue Star scheme does not change the joinder analysis because those charges are dependent on proof of the Blue Star scheme's fraud charges. (ECF No. 37 at 25.)

Money laundering under 18 U.S.C § 1957 does not require proof that the funds allegedly laundered were the result of fraud, but only that the "funds [were] criminally derived, whatever the underlying crime." (ECF No. 33 at 6 (citing *United States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017)).) But money laundering, like bank, mail, and wire fraud, is a crime of deceit, which suggests that the offenses are not so categorically distinct. *Cf. United States v. Barber*, 591 F. App'x 809, 822 (11th Cir. 2014) (upholding joinder of false-statement counts with conspiracy, tax fraud, and wire fraud counts, in part, because "[b]oth categories of offenses were crimes of deceit"). And, apart from money laundering, the only criminal conduct charged in relation to the Blue Star scheme (or in the indictment for that matter) is fraud of some sort. As such, for the government to prove the money laundering charges, it will also need to prove the money laundered was the result of fraud. Given that money laundering and fraud are both crimes of deceit, and that the money laundering charges are intertwined with the Blue Star scheme's fraud charges, their presence in the Blue Star scheme does not warrant severance of the two schemes.

In sum, while the IEF scheme and the Blue Star scheme involve charges arising under different statutes, the conduct charged in the two schemes is sufficiently similar as to satisfy the same or similar character requirement of Rule 8(a) joinder.

### 5.2. Prejudice Under Rule 14(a)

Even when joinder is proper under Rule 8(a), a court has the discretion to order separate trials when "joining offenses … for trial appears to prejudice a defendant." Fed. R. Crim. P. 14(a). The burden is on the defendant to make a "strong showing of prejudice," *United States v. Moya-Gomez*, 860 F.2d 706, 768 (7th Cir. 1988), which requires showing more than that conducting separate trials increases the defendant's chances of obtaining an acquittal, *United States v. Ervin*, 540 F.3d 623, 629 (7th Cir. 2008).

Braeger argues that severance of the two schemes under Rule 14(a) is warranted because their joinder raises a risk of prejudice. (ECF No. 33 at 8.) Specifically, Braeger argues that there is a risk that "proof of one scheme could spillover and make the jury convict [him] of the second scheme." (ECF No. 33 at 9.) In other words, "if the jury found he committed one instance of fraud, they could easily make the inferential leap that he must have committed the second, whatever the evidence says." (ECF No. 33 at 9 (citing *United States v. Davis*, 724 F.3d 949, 956 (7th Cir. 2013)).)

The Seventh Circuit has explained that, "when offenses are joined because 'of their same or similar character,' the risk of unnecessary unfairness infiltrating the joint trial is elevated." *Coleman*, 22 F.3d at 134. Further, when compared to joinder of counts based on the same or closely connected acts or transactions, "[t]here is no comparable saving of trial time when offenses that are related only by being of the same type are joined, since the offenses are usually proven by different bodies of evidence." *Id.* (internal citation

omitted). Thus, because of the heightened risk of prejudice and reduced efficiency, "the district court should be especially watchful for possible jury confusion, illegitimate cumulation of evidence or other sources of prejudice." *Id.*

That said, the burden—although lessened given the reduced efficiency and heighted potential for prejudice of a joint trial—remains on Braeger to demonstrate that he will be prejudiced by a joint trial. *Moya-Gomez*, 860 F.2d at 768. This requires that he "rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court to consider each [count] separately." *United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995). Nowhere in Braeger's argument does he address the potential of limiting instructions as a cure for the risk that the jury might mistake evidence of one fraud for evidence of the second. *See United States v. Carter*, 695 F.3d 690, 700 (7th Cir. 2012) ("Even if the defendants can show prejudice, that alone may not necessarily suffice for them to prevail; limiting instructions will often cure any risk of prejudice.") And while he hints in his reply brief at the potential for juror confusion due to "complex financial records" (ECF No. 44 at 16), he does not argue that jury instructions would be inadequate to prevent any potential confusion. As such, Braeger has not met his burden to show that severance is necessary under Rule 14(a).

It is worth noting that, even if the two schemes were severed, it appears likely that evidence of one scheme would be admissible in the trial of the other scheme under Federal Rule of Evidence 404(b). Although Rule 404(b)(1) provides that "[e]vidence of

any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" subsection (b)(2) adds that proffered evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1), (2).

Both of Braeger's schemes were active from August 2017 to August 2018, and both involved him making false statements in PPMs to induce investments in business ventures, which investments he ultimately used to fund his lifestyle. (ECF No. 1 at ¶¶ 1-10, 21-25.) Given the similarity in the schemes' designs and executions, as well as the temporal overlap, the government would have a strong argument for admitting evidence of one scheme in the trial of the other. And the spillover prejudice argument under Rule 14(a) fails where evidence is likely to be admissible in separate trials if severance were to be granted. *See, e.g.*, *United States v. Hollis*, 971 F.2d 1441, 1456-57 (10th Cir. 1992) (upholding denial of severance in part because, "had separate trials been granted, the evidence of similar conduct would likely have been admissible anyway under Fed. R. Evid. 404(b), as showing intent or lack of mistake"); *United States v. Greene*, No. 94-10312, 1995 WL 227380 (Table), at *1 (9th Cir. Apr. 17, 1995) ("[J]oinder of separate offenses is permissible if evidence of these 'other acts' would be admissible to show motive, intent, or common scheme.") (internal quotations and citations omitted).

In sum, the IEF and Blue Star schemes satisfy the same or similar character requirement for joinder under Rule 8(a), and Braeger has not met his burden under Rule 14(a) of demonstrating that severance of the two schemes is necessary to avoid undue prejudice. Therefore, the court will order that his motion to sever counts 5-10 be denied.

### 6. Bill of Particulars (ECF No. 34)

Braeger has also filed a motion for a bill of particulars. (ECF No. 34.) Specifically, he moves for an order requiring the government to identify the specific "false and fraudulent premises, representations, promises, and omissions" it intends to rely on for the bank fraud charged in counts 1-3, the mail fraud charged in count 5, and the wire fraud charged in counts 6-8. He also moves for an order compelling the government to identify the names of unindicted coconspirators.

Federal Rule of Criminal Procedure 7(f) permits the court to order the government to provide a defendant with a bill of particulars so that the defendant can prepare an adequate defense. *See* Fed. R. Crim. P. 7(f); *United States v. Kendall*, 665 F.2d 928, 949 (7th Cir. 1981). A bill of particulars is "a more specific expression of the activities the defendant is accused of having engaged in which are illegal." *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991). A bill of particulars is required where the indictment's charges are so general that they do not advise the defendant of the specific act of which he is accused. *See id.*

The test for determining whether a bill of particulars should be granted is similar to the test for determining the general sufficiency of the indictment: in both cases the key question is "whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003) (quoting *Kendall*, 665 F.2d at 134); *Canino*, 949 F.2d at 949. "An indictment which includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated is sufficient to pass this test." *United States v. Shanks*, No. 18-CR-18, 2018 WL 3439639, at *4 (E.D. Wis. July 17, 2018) (citing *Kendall*, 665 F.2d at 134).

"[A] defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *Kendall*, 665 F.2d at 134 (citations omitted). Moreover, where a defendant can access the information necessary for his defense "through some other satisfactory form," a bill of particulars is unnecessary. *Id.* (citing *Fassnacht*, 332 F.3d at 447, n.2). For example, the Seventh Circuit has held that the government's "open file" policy is one such "satisfactory form" for providing the defendant with access to information, making a bill of particulars unnecessary. *Id.* (citing *Canino*, 949 F.2d at 949).

Braeger asks that the government be required to "identify the 'false and fraudulent premises, representations, promises, and omissions,' that [it] intends to rely on" with

respect to the fraud alleged in counts 1-3, which relate to the IEF scheme, and counts 5-8, which relate to the Blue Star scheme. (ECF No. 34 at 2-3.) He argues that "[i]n order to fairly defend these charges, [he] needs to be apprised of what specific statements and omissions are at issue." (ECF No. 34 at 3.) He points out that "the government has produced tens of thousands of pages of discovery, and alleges that [he] made both material misstatements and omissions over an extended period of time." (ECF No. 34 at 3.) He argues he "should not have to guess about which statements the government will base its case upon." (ECF No. 34 at 3.)

In response, the government argues that the allegations in the indictment provide Braeger with sufficient notice of the nature of the false statements at issue and its case theory, which is "all of the information that he is entitled to under the law." (ECF No. 37 at 32-33 (citing ECF No. 1 at ¶¶ 1, 4, 6, 14, 16, 18, 22-25).) Beyond the detail provided in the indictment, however, the government argues that, while it has certainly turned over to Braeger a substantial amount of discovery, the information he seeks in a bill of particulars only relates to his communications with those he defrauded, and therefore "all [Braeger] needs to do to find his own misrepresentations is to examine the communications he had with investors (his own emails and the PPMs he distributed) and the interviews law enforcement conducted with his victims (which are relatively short)." (ECF No. 37 at 33-34.) The government argues that requiring it to provide Braeger with more detail than it already has "would essentially require [it] to produce a road-map of

its trial evidence and strategy," which "would be extremely prejudicial … and contrary to the law." (ECF No. 37 at 35-36.)

The indictment sufficiently outlines for Braeger the nature of the misrepresentations giving rise to the bank fraud charged in counts 1-3. The indictment explains who he made the relevant misrepresentations to (J.P. and BMO Harris), the form in which the misrepresentations were made (a PPM), and the subject of those misrepresentations (how investor's funds would be used for IEF). (ECF No. 1 at ¶¶4, 6.) The indictment also specifies the material misrepresentation made to BMO Harris—*i.e.*, "that any funds deposited in the [IEF business] account would not be used for personal, consumer, or household use." (ECF No. 1 at ¶ 3.) Thus, the indictment provides Braeger with notice of the government's theory of bank fraud and the specifics of the underlying misrepresentations. This is more than enough to obviate the need for a bill of particulars for counts 1-3. *See Kendall*, 665 F.2d at 134 (quoting *United States v. Roya*, 574 F.2d 386, 391 (7th Cir. 1978)) (providing that a bill of particulars in unnecessary where "the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial").

Braeger cites *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941 (N.D. Ill. 2011), in support of his argument that he should not have to guess which of his statements the government will rely on for counts 5-8. (ECF No. 34 at 3.) *Vasquez-Ruiz* involved a physician charged with mail fraud for a scheme in which he was alleged to have ordered

27

medically unnecessary tests for patients and submitted $400,000 in fraudulent bills to insurance companies over a nearly four-year period. *Id.* at 943. The court granted the defendant's motion for a bill of particulars, requiring that the government identify the bills it contended were fraudulent. *Id.* Without that information, the defendant would have had to either prepare a defense against every medical test he ordered for patients over the nearly four-year period or guess which bills in the 17,000 pages of discovery the government would contend at trial were fraudulent. *See id.*

Braeger has sufficient notice of the nature of the fraudulent statements on which the government will rely in prosecuting counts 5-8. Whereas the defendant in *Vasquez-Ruiz* was left to guess which of the medical procedures he ordered over a four-year period were "unnecessary," the nature of Braeger's fraud is evident such that—regardless of the volume of the discovery—a bill of particulars is unnecessary to elucidate what is already clear: the relevant fraudulent misrepresentations are those Braeger made in PPMs and emails to Blue Star investors about how their investments were to be used, and the results their investments were generating. These details provide Braeger with sufficient notice of the nature of his fraudulent representations and the government's theory of the case so that he can prepare a defense. That is what he is entitled to under the relevant precedent, and the government need not be more specific.

As to Braeger's request that the government provide him with the identities of any unindicted coconspirators, the government states "that it can do so within 60 days of

the Court's order on these motions." (ECF No. 37 at 36.) The court will order that the government make good on its offer. However, the court will deny Braeger's motion for a bill of particulars to the extent it requests that the government be required to identify which false statements or omissions it intends to rely on for counts 1-3 and 5-8.

IT IS THEREFORE RECOMMENDED that Braeger's motion to dismiss counts 1-3 for failure to state a claim (ECF No. 32) be DENIED.

IT IS FURTHER RECOMMENDED that Braeger's motion to dismiss counts 1-3 as multiplicitous (ECF No. 35) be DENIED.

IT IS FURTHER ORDERED THAT Braeger's motion to strike surplusage from the indictment (ECF No. 31) is DENIED.

IT IS FURTHER RECOMMENDED that Braeger's motion to dismiss count 4 for failure to state a claim (ECF No. 36) be DENIED.

IT IS FURTHER ORDERED THAT Braeger's motion to sever counts 5-10 (ECF No. 33) is DENIED.

IT IS FURTHER ORDERED THAT Braeger's motion for bill of particulars (ECF No. 34) is DENIED IN PART and GRANTED IN PART. Within 60 days of this order the government shall provide Braeger with the names of any unindicted coconspirators. In all other respects, it is denied.

IT IS FURTHER ORDERED that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or

part thereof shall be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

Dated at Milwaukee, Wisconsin this 13th day of December, 2022.

WILLIAM E. DUFFIN
U.S. Magistrate Judge