# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

    v.                                      **Case No. 21-CR-233**

**DAVID OSCAR BRAEGER**
    **Defendant.**

## DECISION AND ORDER

The government obtained a ten-count indictment charging defendant David Braeger with bank, wire and mail fraud, and money laundering, arising out of his alleged execution of two separate investment fraud schemes. Defendant filed a number of pre-trial motions, including motions to dismiss several of the fraud counts and to sever for trial the counts pertaining to the two schemes. The magistrate judge handling pre-trial proceedings denied the motion for severance and recommended denial of the motions to dismiss.

Defendant objects. I consider de novo the recommendation on the motions to dismiss, Fed. R. Crim. P. 59(b), but may set aside the order on the severance motion only if it is contrary to law or clearly erroneous, Fed. R. Crim. P. 59(a). I first set forth the allegations in the indictment, which for present purposes must be accepted as true, see United States v. Moore, 563 F.3d 583, 586 (7th Cir. 2009), before addressing defendant's motions.

## I. THE CHARGES

### A. IEF Scheme

According to the indictment, the "IEF scheme" began in September 2016 when defendant opened a business checking account in the name of the International Energy Fund,

LLC ("IEF") at BMO Harris Bank. (R. 1 at 1 ¶ 2.) In opening this account, defendant represented to the bank that funds deposited into the account would not be used for personal, consumer, or household use. (Id. at 2 ¶ 3.) Defendant purportedly formed IEF to invest in the construction of a geothermal energy plant in Uganda. (Id. at 2 ¶ 4.) To solicit funds for the IEF scheme, defendant distributed private placement memoranda ("PPM") to potential investors, including J.P. (Id. at 2 ¶ 5.) The PPM defendant distributed to J.P. contained material misrepresentations about IEF's plan to use investors' funds for the Ugandan energy plant. (Id. at 2 ¶ 6.) J.P. relied on those representations, providing defendant with a $100,000 check payable to IEF for investment in the Ugandan energy plant, which defendant deposited into the IEF business account on September 6, 2016. (Id. at 2 ¶¶ 7-8.)

Count one of the indictment charges defendant with bank fraud under 18 U.S.C. § 1344(2), alleging that on September 6, 2016, in furtherance of the IEF scheme and to obtain money in the care, custody and control of BMO Harris Bank, defendant knowingly transferred $10,000 of J.P.'s investment funds from the IEF business account to a Wells Fargo account in the name of another entity, which he used as a pass-through personal account. After transferring the $10,000, he fraudulently spent the money on personal expenses. (R. 1 at 3 ¶¶ 11-14.) Counts two and three also charge bank fraud under § 1344(2), alleging that on September 21, 2016, defendant fraudulently withdrew $21,538.99 from the IEF business account to buy a personal vehicle (R. 1 at 4 ¶¶ 15-16), and on October 27, 2016, defendant fraudulently issued a check for $3000 for the payment of personal legal fees (R. 1 at 5 ¶¶ 17-18). Count four of the indictment charges defendant with wire fraud, 18 U.S.C. § 1343, incorporating the background allegations regarding the IEF scheme and alleging that on August 24, 2018, for the purpose of executing the IEF scheme, defendant knowingly sent an e-mail

2

to J.P. intended to continue the deception of J.P. regarding the status of his investment and reduce the likelihood of jeopardizing the IEF scheme. (R. 1 at 6 ¶¶ 19-20.)

**B.     Blue Star Scheme**

The indictment further alleges that in August 2017 defendant formed Blue Star Automotive Fund, L.P. ("Blue Star"), through which he offered and sold shares in an entity ostensibly formed as an investment vehicle to make loans to an Arizona-based auto dealer doing business as Onyx Motorsports. (R. 1 at 7 ¶¶ 21-22.) To solicit investments in Blue Star, defendant made false and misleading material statements and omissions in PPMs and e-mail communications, which investors relied upon in providing funds to defendant. (R. 1 at 7 ¶ 23.) Instead of using the funds for the purposes represented in the PPMs and emails, defendant defrauded investors by making payments to other investors under the guise of legitimate investment returns (i.e., "Ponzi-scheme payments"), paying for personal expenses, and investing in other business ventures unrelated to Blue Star. (R. 1 at 7-8 ¶ 24.)

Count five charges defendant with mail fraud, 18 U.S.C. § 1341, alleging that from August 8, 2017, through August 10, 2017, for the purpose of executing the Blue Star scheme, defendant caused to be delivered by private commercial interstate carrier an investment check for $100,000 from R.G. to defendant. (R. 1 at 9 ¶¶ 31-33.) Counts six, seven, and eight charge wire fraud, 18 U.S.C. § 1343, based on three withdrawals defendant made from the Blue Star account between August 15 and August 17, 2017. (R. 1 at 10-11.) Finally, counts nine and ten charge defendant with unlawful monetary transactions, 18 U.S.C. § 1957, based on the purchase of two sports cars with the proceeds of his fraud. (R. 1 at 12.)

3

## II.  MOTIONS TO DISMISS

Defendant moved to dismiss counts one through three for failure to state an offense and because they are multiplicitous, and to dismiss count four for failure to state a claim.  For the reasons that follow, I find that counts one through three fail to state the offense of bank fraud; it is therefore unnecessary to address the multiplicity argument.  Count four, however, properly states a wire fraud offense.

**A.     Legal Standard**

Pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v), a defendant may move to dismiss an indictment for failure to state an offense.  To survive a motion to dismiss, the indictment must (1) state all the elements of the crime charged; (2) adequately inform the defendant of the nature of the charges so that he may prepare a defense; and (3) allow the defendant to plead the judgment as a bar to any future prosecutions.  United States v. White, 610 F.3d 956, 958 (7th Cir. 2010).  In reviewing the sufficiency of an indictment, a court should consider each challenged count as a whole and refrain from reading it in a hyper-technical manner; the indictment must be read to include facts which are necessarily implied and construed according to common sense.  United States v. Palumbo Bros., 145 F.3d 850, 860 (7th Cir. 1998); see also United States v. Yashar, 166 F.3d 873, 880 (7th Cir. 1999) ("We must view all facts in the light most favorable to the government on a motion to dismiss[.]").  Thus, failure to explicitly include all the elements of the offense in an indictment is not fatal so long as the absent elements can be deduced from the language that is actually included in the charging document. United States v. Ramsey, 406 F.3d 426, 430 (7th Cir. 2005).  If, however, the court is unable to discern an essential requirement of the charged offense, the court must grant the motion to

4

dismiss. E.g., United States v. Bruce, 531 F. Supp. 2d 983, 989-90 (N.D. Ill. 2008).

**B.     Counts One-Three**

Defendant moved to dismiss counts one through three, arguing that they fail to state the offense of bank fraud. He relied on Loughrin v. United States, 573 U.S. 351, 365 (2014), which held that to establish an offense under 18 U.S.C. § 1344(2) the defendant's false statement must be "the mechanism naturally inducing a bank (or custodian) to part with its money." (R. 32 at 1.) Defendant argued that, while the indictment alleges that he made representations to BMO Harris regarding how he would use the IEF business account, the indictment does not allege that this statement was false or material, or that it induced the bank to later part with funds in its control, as charged in counts one, two and three. (R. 32 at 7-8.) The indictment further alleges that defendant made material misrepresentations to potential investors to secure their funds, but it does not allege that these statements were passed on to the bank or that they otherwise induced the bank to later release funds. (R. 32 at 9.) Finally, the indictment does not allege that defendant made any specific false statements to BMO Harris in connection with the three charged withdrawals from the account. (R. 32 at 2-3.) The indictment thus fails to allege an essential element: that defendant made a material false statement that naturally induced BMO Harris to allow him to withdraw money from the account. (R. 32 at 7.)

The government responded that a scheme to defraud can have multiple victims, i.e., a bank and an individual, and the indictment here alleges false statements to both BMO Harris and J.P. (R. 37 at 4.) To the bank, defendant lied about how he would use the account; to the investors, he lied about how he would use their money. (R. 37 at 10.) The government further stated that it would at trial show that there are reasons why banks distinguish between personal and business accounts, and that there are limitations on the uses of the two types of accounts.

5

"It will, therefore, show that Defendant's representations to BMO, which were false, mattered, and were the mechanism by which he was able to obtain property in BMO's custody." (R. 37 at 10.) Finally, the government argued that the bank's involvement here was not "wholly fortuitous," Loughrin, 573 U.S. at 364, in that defendant specifically set up the BMO account for purposes of carrying out his scheme; he needed a business account to make the investment seem legitimate to the victim, and he used the legitimacy of the bank holding custody of J.P.'s money to steal it. (R. 37 at 11-12.)

Defendant replied that, while the government posits a theory as to how the IEF business account played a role in the fraud scheme, the indictment does not allege his statement to the bank—about how he would use the account—was material or induced the bank to part with money in its care. (R. 44 at 2.) Nor, defendant argued, would it make sense to so allege, as banks do not track each transaction for conformity with the terms of the account. (R. 44 at 2.) That the type of account may have mattered to J.P. in this instance does not mean it mattered to the bank when it released the funds. (R. 44 at 4.) Finally, defendant stressed the breadth of the government's argument, which would turn every breach of an account agreement into federal bank fraud, exposing the customer to 30 years in prison. (R. 44 at 3.)

The magistrate judge determined that defendant's representation to BMO Harris—that he would not use funds in the business account for personal use—is properly construed "as a mechanism naturally inducing a bank (or custodian) to part with its money because it was a necessary step toward the fraudulent withdrawals charged in counts 1-3." (R. 45 at 7, internal quote marks omitted.) The magistrate judge reasoned that without this false statement defendant would not have been able open a business account with BMO Harris in the name of IEF, he would not have been able to deposit into that account a check made out to IEF, and

6

he would not have been able to make the subsequent withdrawals for personal purposes. (R. 45 at 8.) Finally, while the indictment does not explicitly state that defendant's representation to BMO Harris was "false" or that BMO Harris relied on that statement in releasing funds, the magistrate judge concluded that these facts were necessarily implied: the indictment alleges that defendant used the IEF business account's funds for personal use, clearly implying that his representation to BMO Harris was false, and the bank relied on defendant's representation when it allowed defendant to open the account, without which J.P. could not have deposited a check made out to IEF and defendant could not have later made the fraudulent withdrawals. (R. 45 at 8.)

In his objections, defendant primarily argues that counts one to three are mis-charged, charging a scheme to commit wire fraud and/or money laundering as bank fraud. (R. 51 at 1.) The government responds that defendant ignores the relaxed pleading standard and the high burden required to dismiss an indictment. (R. 52 at 2.)

Before turning to the specific arguments in this case, it may be useful to distinguish between the bank fraud statute and the mail/wire fraud statutes. The latter statutes, enacted pursuant to Congress's Postal and Commerce powers, see United States v. Louper-Morris, 672 F.3d 539, 563 (8th Cir. 2012), rely upon use of the mail or the interstate wires as a "jurisdictional hook" permitting the prosecution of fraudulent schemes in federal court. See, e.g., United States v. Martin, 195 F.3d 961, 967 (7th Cir. 1999); see also United States v. Hoffman, 901 F.3d 523, 536 (5th Cir. 2018) (noting that the mail and wire fraud statutes have the same elements other than the jurisdictional hook of the mailing or interstate wire transmission). As courts have noted, the fraud, and not the mailing/wire transmission, is the central conduct of such offenses. See United States v. Wood, 364 F.3d 704, 725-26 (6th Cir.

2004). The use of the mail or wires need not be an essential element of the scheme; it is sufficient for the mailing/wire transmission to be incident to an essential part of the scheme or, more colloquially, "a step in the plot." Schmuck v. United States, 489 U.S. 705, 710-11 (1989); United States v. White, 737 F.3d 1121, 1129 (7th Cir. 2013).[1]

The "jurisdictional element" in a bank fraud prosecution is that the bank was insured by the FDIC. See, e.g., United States v. Schultz, 17 F.3d 723, 725 (5th Cir. 1994); see also Loughrin, 573 U.S. at 366 (citing S. Rep. No. 98-225, at 378 (noting that federal "jurisdiction is based on the fact that the victim of the offense is a federally controlled or insured institution")). As the Seventh Circuit has noted, "the purpose of [the bank fraud statute] is not to protect people who write checks to con artists but to protect the federal government's interest as an insurer of financial institutions." United States v. Davis, 989 F.2d 244, 246-47 (7th Cir. 1993). Consistent with this purpose, the bank fraud statute should not be construed like the mail/wire fraud statutes, with the incidental use of a bank as part of a fraud scheme targeting others supplying the "jurisdictional hook."

The bank fraud statute provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years,

---

[1] As will be relevant to the motion to dismiss count four, discussed below, use of the mail/wires to lull victims into a false sense of security violates the statutes, even if it occurs after the money has been fraudulently obtained. E.g., United States v. Turner, 551 F.3d 657, 668 (7th Cir. 2008).

8

or both.

18 U.S.C. § 1344. As indicated above, the government charged the bank fraud counts in this case under § 1344(2).

For years, lower courts struggled over whether in a prosecution under sub.(2) the government had to show intent to defraud the bank and, if not, how to otherwise limit the scope of the statute consistent with its purpose. Compare United States v. Leahy, 445 F.3d 634, 642-43 (3rd Cir. 2006) (reading the statute conjunctively and holding that intent to defraud the bank applies to sub.(1) and sub.(2)); id. at 646-47 (further holding that where the bank is the "target of the deception" the defendant need not have an intent to harm the bank, but where the bank is merely an "unwitting instrumentality" the government must prove intent to cause the bank a loss or potential liability); and United States v. Sprick, 233 F.3d 845, 852 (5th Cir. 2000) ("Under our precedent, for the prosecution to prove that the offense of bank fraud has been committed, it must show not only that the money or assets in the custody or control of a financial institution were obtained by means of fraud but also that doing so placed the financial institution at risk of civil liability."), with United States v. Everett, 270 F.3d 986, 991 (6th Cir. 2001) (finding it sufficient if the defendant, in the course of committing fraud on someone, causes a federally insured bank to transfer funds under its possession and control, while acknowledging that "in cases where the bank has minimal involvement, such as where a swindler deceives someone into voluntarily writing checks to the swindler on a good account, the government would . . . be better advised to proceed under the wire or mail fraud statutes").

The Supreme Court resolved the issue in Loughrin, a case in which the defendant used stolen and forged checks to buy merchandise at Target, which he then returned for cash. 573 U.S. at 353. Charged under § 1344(2), Loughrin argued that the government should be

9

required to prove intent to defraud the bank, not just Target. Id. at 354-55.

The Court read the statute disjunctively and held that intent to defraud the bank applied to prosecutions under sub.(1), but not sub.(2). Id. at 357-58. Loughrin argued that, so read, the statute could extend to any fraud in which the victim happens to pay with a check. Id. at 361.

> Consider, for example, a garden-variety con: A fraudster sells something to a customer, misrepresenting its value. There are countless variations, but let's say the fraudster passes off a cheap knock-off as a Louis Vuitton handbag. The victim pays for the bag with a good check, which the criminal cashes. Voila!, Loughrin says, bank fraud has just happened—unless we adopt his narrowing construction. After all, the criminal has intended to "obtain . . . property . . . under the custody or control of" the bank (the money in the victim's checking account), and has made "false or fraudulent . . . representations" (the lies to the victim about the handbag).

Id. at 361-62.

The Court acknowledged these concerns but rather than reading an additional element into the statute noted "a significant textual limitation on §1344(2)'s reach." Id. at 362.

> Under that clause, it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property "by means of" the misrepresentation. That phrase typically indicates that the given result (the "end") is achieved, at least in part, through the specified action, instrument, or method (the "means"), such that the connection between the two is something more than oblique, indirect, and incidental. In other words, not every but-for cause will do. . . .
>
> Section 1344(2)'s "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control. That occurs, most clearly, when a defendant makes a misrepresentation to the bank itself—say, when he attempts to cash, at the teller's window, a forged or altered check. In that event, the defendant seeks to obtain bank property by means of presenting the forgery directly to a bank employee. But no less is the counterfeit check the "means" of obtaining bank funds when a defendant like Loughrin offers it as payment to a third party like Target. After all, a merchant accepts a check only to pass it along to a bank for payment; and upon receipt from the merchant, that

10

> check triggers the disbursement of bank funds just as if presented by the fraudster himself. So in either case, the forged or altered check—i.e., the false statement—serves in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property. . . .
>
> By contrast, the cases Loughrin hopes will unnerve us—exemplified by the handbag swindle—do not satisfy §1344(2)'s "means" requirement. Recall that in such a case the check is perfectly valid; so the check itself is not (as it was here) a false or fraudulent means of obtaining bank money. And the false pretense that has led, say, the handbag buyer to give a check to the fraudster has nothing to do with the bank that will cash it: No one would dream of passing on to the bank (as Target would forward a forged check) the lie that a knock-off is a Louis Vuitton. The bank's involvement in the scheme is, indeed, wholly fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash. Of course, the bank would not have disbursed funds had the misrepresentation never occurred, and in that sense, the lie counts as a but-for cause of the bank's payment. But as we have said, §1344(2)'s "by means of" language requires more: It demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money. And in cases like the handbag swindle, where no false statement will ever go to a financial institution, the fraud is not the means of obtaining bank property.

Id. at 362-65 (internal citations and footnotes omitted).

The present case is not quite the same as the handbag swindle. The government claims that defendant victimized his own bank, not J.P.'s. Cf. id. at 361 n.5 (collecting cases in which the government attempted to prosecute defendants for bank fraud based on valid checks issued from the victim's account). The indictment, fairly read, does allege that defendant made a false representation to BMO Harris when he opened the account. One can also infer that, but for this false representation, defendant would not have been able to open the business account into which he deposited J.P.'s funds, which he later withdrew for his own use. But as Loughrin stressed, not every but-for cause will suffice; the statute "demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money." Id. at 364-65. Setting up the business account may have been a step in

11

the plot to acquire J.P.'s money,[2] but the bank fraud statute requires more. Even read in the light most favorable to the government, it cannot be inferred that defendant's false statement in setting up the account induced the bank to later disburse the funds alleged in counts one, two, and three.[3]

---

[2]I need not decide whether it was necessary for defendant to have the business account in order to deposit J.P.'s check. (See R. 45 [recommendation] at 8, stating that without the account "J.P. could not have deposited a check made out to IEF"; R. 51 [objections] at 5, stating that as the creator of the LLC defendant could have endorsed the check over to himself and deposited it into his personal account.) Section 1344(2) is not concerned with fraud in opening an account; it requires a false statement inducing a bank to release funds. Cf. United States v. Loutos, 284 F. Supp. 2d 942, 961 (N.D. Ill. 2003) (discussing the elements of 18 U.S.C. § 1014 where the defendant made a false statement in opening an account). The government supports the recommendation's chain of reasoning: "that absent Defendant's false statements to BMO Harris, he would not have had an IEF business account into which to deposit his investor's check, and thus would not have been able to put the bank at risk by converting J.P's funds." (R. 52 at 2.) However, the government cites no authority supporting the proposition that a lie in opening an account turns subsequent withdrawals from that account into bank fraud under § 1344(2). Cf. United States v. Peterson, 823 F.3d 1113, 1118, 1120-21 (7th Cir. 2016) (affirming bank fraud conviction where the defendant drew on his business's line of credit, limited by its terms to business purposes, to pay a personal gambling debt, obtaining the funds by means of a specific, false statement regarding the purpose of the subject disbursement). Nor is it clear how defendant's misuse of the business account to steal J.P.'s investment put the bank at risk. See Chen Jun v. Regions Bank, No. 1:19-CV-01524-KOB, 2020 U.S. Dist. LEXIS 170922 (N.D. Ala. Sept. 18, 2020) (rejecting civil claim by investors against bank holding a business account set up by and into which fraudsters deposited and then stole the investors' funds). Moreover, as defendant notes, the government's construction of the statute could make federal felons of every small business owner who uses a business account for personal expenses. See Cleveland v. United States, 531 U.S. 12, 24 (2000) ("We resist the Government's reading of § 1341 . . . because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress."). Such a construction would also allow the bank fraud statute to swallow the money laundering statute (at least where, as here, the account is funded with proceeds of unlawful activity and the transactions are of sufficient size). Indeed, in this very case the government charged defendant in counts nine and ten with violations of 18 U.S.C. § 1957 based on monetary transactions from the Blue Star account. (R. 1 at 12.) Of course, criminal statutes may overlap, but the existence of another provision more naturally covering such transactions weighs against the government's broad reading of § 1344(2).

[3]The Loughrin Court agreed that federal jurisdiction under § 1344(2) should not turn on the fortuity of the victim paying with a check rather than cash. 573 U.S. at 362. It also should

12

I do not understand the government to argue defendant's false statement to J.P. qualifies under Loughrin. This statement clearly fits within the handbag hypothetical. Perhaps the existence of the business account lent defendant's scheme an air of legitimacy, further inducing J.P. to invest. But under Loughrin the issue is the impact of the statement on BMO Harris Bank, not J.P.; moreover, there is no allegation that the misrepresentations in the PPM ever made their way to the bank.

This is not to impose a "magic words" requirement, as the government suggests. (R. 52 at 2-3.) Nor is it to question the strength of the evidence; the government contends that at trial it will show that banks distinguish between account types and that without his misrepresentation defendant would not have been able to utilize BMO Harris to misappropriate J.P.'s money. (R. 52 at 3.) As discussed above, this does not amount to bank fraud under § 1344(2). See United States v. Risk, 843 F.2d 1059 (7th Cir. 1988) (affirming pre-trial dismissal where the uncontested facts did not state an offense).

The government further argues that whether defendant's misrepresentation made the bank part with its money is for the jury to decide; the court need only determine whether the indictment alleges that it did. The government contends that the indictment does so allege. The indictment avers that defendant's misrepresentation during account opening was an integral part of his scheme to defraud; the government will show defendant needed the bank and the IEF account to accomplish the scheme, and that his misappropriation of the victim's

---

not turn on the fortuity of the defendant depositing a victim's check into his own bank account and then withdrawing the money. As defendant noted in his initial reply before the magistrate judge, this scenario would also seem to fit within the Loughrin Court's handbag hypothetical; even if the fraudster in that hypothetical told the victim he had a business account and to make the check for the handbag out to that account, he still had not made any false statements inducing the bank to do anything. (R. 44 at 5-6.)

13

money put the bank at risk. Thus, the government contends, the bank's involvement was not merely fortuitous, and the indictment properly alleges bank fraud charges. (R. 52 at 4.) But as this summary makes clear, the indictment does not allege that defendant's false statement induced the bank to part with money.[4] (R. 53 at 1.) Rather, that statement was just a step in the plot to defraud investors. The motion to dismiss the bank fraud counts will be granted.

## C. Count Four

Defendant also moved to dismiss count four for failure to state an offense, arguing that the lulling e-mail he sent to J.P. did not further the IEF scheme; nor, he argued, did the indictment allege that he schemed or intended to defraud J.P. (R. 36 at 1.) Paragraphs 1-10, which set forth the background allegations, describe a bank fraud scheme in which the victim is BMO Harris. (R. 36 at 2.) But then count four charges wire fraud directed at J.P., without alleging a new or separate scheme, without alleging J.P. to be a victim of the IEF scheme or that defendant intended to defraud J.P., and without alleging that the e-mail to J.P. was designed to prevent BMO Harris from discovering the (completed) bank fraud. (R. 36 at 3.)

The government responded that a scheme to defraud can have multiple victims, and here defendant developed a scheme to steal money from J.P. in the course of which he also lied to the bank. (R. 37 at 4.) The government further responded that the indictment sufficiently lays out the four elements of wire fraud: (1) that defendant devised a scheme to defraud; (2) that he did so with intent to defraud; (3) that the scheme involved a materially false

---

[4]In reply, defendant contends that the reason for the omission seems fairly obvious: the claim would not be true. "What an individual tells a bank when opening an account does not serve as 'the means' inducing that bank to allow for later withdrawals from that account—the information the account holder communicates <u>when they seek the withdrawals</u> are the means." (R. 53 at 2.)

14

or fraudulent representation; and (4) that for the purpose of carrying out the scheme defendant caused interstate wire communications to take place. (R. 37 at 6-7.)

The magistrate judge concluded:

The indictment sufficiently alleges the requisite elements of a wire fraud charge under the lulling theory. The IEF scheme's background allegations outline how Braeger knowingly devised and executed a scheme to defraud in which J.P.—who relied on the material misrepresentation in the PPM when he decided to invest $100,000 with Braeger—was a victim. Paragraph 20 adds that Braeger sent an email to J.P., intending to continue the deception of J.P. regarding the status of his investment and reduce the likelihood of jeopardizing the IEF scheme. Braeger's email fits the lulling theory because it was intended to facilitate concealment or postpone investigation of the scheme [to defraud]. Thus, the indictment sufficiently alleges all four elements of a wire fraud charge under 18 U.S.C. § 1343.

(R. 45 at 15, internal citations and quote marks omitted).

In his objections, defendant reiterates his argument that the indictment should have alleged a separate wire fraud scheme; that the indictment fails to allege J.P. is a victim of the IEF scheme or that defendant intended to defraud J.P., such that any continued deception of J.P. did nothing to further the charged bank fraud scheme; and that the bank fraud scheme had been completed for two years when the wire transmission charged in count four occurred. (R. 51 at 12.) He faults the recommendation for failing to grapple with his arguments, assuming into existence an entirely unalleged wire fraud scheme (R. 51 at 12-13); overlooking the indictment's failure to allege intent to defraud J.P. (R. 51 at 13); and relying on lulling caselaw when the indictment fails to properly allege a scheme the count four email was designed to continue or conceal (R. 51 at 14).

Read in a common sense fashion, the indictment describes an overarching scheme in which defendant sought to defraud J.P. Specifically, paragraphs 6 and 7 allege that defendant made material misrepresentations to J.P., and that J.P. relied on those representations in

15

providing a $100,000 investment check. (R. 1 at 2.) The indictment further alleges that defendant "continued the deception of J.P." in the charged wire communication. (R. 1 at 6 ¶ 20). Defendant draws a distinction between intent to defraud and intent to deceive (R. 51 at 13), but the indictment sufficiently alleges both: defendant sought to cheat J.P. out of his money through false representations about IEF's plan to use investors' funds for the Ugandan energy plant (R. 1 at 2 ¶ 6) and then continued the deception via the lulling e-mail (R. 1 a 6 ¶ 20). Defendant's insistence that the indictment had to allege a separate wire fraud scheme targeting J.P. ignores the fact that a single fraud scheme may be multi-faceted and have more than one victim or object, see United States v. Palazzo, 372 Fed. Appx. 445, 452 (5th Cir. 2010); United States v. Caldwell, 302 F.3d 399, 408 (5th Cir. 2002); United States v. Zeidman, 540 F.2d 314, 318 (7th Cir. 1976), and, indeed, may violate more than one criminal statute, see United States v. Gutierrez, 963 F.3d 320, 339 (4th Cir. 2020).

Finally, defendant concedes that a lulling email sent after the money has been obtained can give rise to liability for wire fraud, consistent with the caselaw cited above and in the magistrate judge's recommendation. See Turner, 551 F.3d at 668. His only response is that here the indictment alleges a completed bank fraud scheme. (R. 36 at 7.) For the reasons set forth above, the indictment sufficiently alleges a fraud scheme directed at J.P., so the lulling caselaw is applicable to the wire transmission charged in count four.

### III. OTHER MOTIONS

I will defer consideration of the objection to the severance order. Given the dismissal of counts one through three, the posture of the case may change. The objection to the denial of defendant's motion to strike paragraphs 3 and 14 as surplusage may be moot, as those paragraphs pertain to the bank fraud charges. However, I will also make no ruling on that

16

objection at this time. Finally, given the narrowing of the charges through this order, I will defer for now ruling on defendant's objection to the magistrate judge's order granting in part and denying in part the motion for a bill of particulars. I will explore these case management issues with the parties at the upcoming status hearing set for February 27, 2023.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 45) is adopted in part, as stated herein; defendant's motion to dismiss counts one through three for failure to state a claim (R. 32) is granted; defendant's motion to dismiss counts one through three as multiplicitous (R. 35 ) is found moot; and defendant's motion to dismiss count four for failure to state a claim (R. 36) is denied.

Dated at Milwaukee, Wisconsin, this 21st day of February, 2023.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge