UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

DAVID BRAEGER,

        Defendant.

Case No. 21-cr-233 (LA)

## SENTENCING MEMORANDUM

David Braeger stole millions of dollars from unsuspecting victims whom he convinced to "invest" with him because of his business acumen, family history, and expertise in the financial and automobile industry. Although there is evidence to suggest that, like most Ponzi schemers, Defendant did not begin his investment ventures with the goal of defrauding investors, the evidence also shows that Defendant had little hesitation about lying to potential investors to get money or about spending that money to benefit himself. And though Braeger did not defraud his investors to fund an extravagantly lavish lifestyle, he did brazenly spend his victims' money on things that got his name in the paper: funding a NASCAR racecar, buying a defunct but locally significant restaurant, and donating to a local K-9 unit.[1] Notably, Braeger had no source of income

---

[1] https://www.jsonline.com/story/communities/northshore/news/glendale/2018/08/21/silver-spring-house-sponsoring-nascar-and-using-glendales-logo/986700002/; https://onmilwaukee.com/articles/silver-spring-house-to-reopen;

other than his investors' funds, so when Braeger spent money to aggrandize himself, he did so with money he stole. Braeger also used his victims' money to pay his own bills and buy his teenage son a fancy car to drive. (PSR ¶ 20).

Ultimately, Braeger's scheme fits the mold of many Ponzi schemes – he started out with a potentially legitimate investment idea, and then chose to skim money from his investors to fund the lifestyle he wanted while staying ahead of being caught by making Ponzi payments to earlier investors. The fact that Braeger may have started out with good intentions, or that some of the money was lost because Braeger himself was defrauded, does not change the devastating impact his crime had on his victims. Moreover, the instant fraud is not the first time Braeger has been accused of similar conduct.

These facts warrant a significant sentence of incarceration, and the government suggests that 30 months' imprisonment is the appropriate sentence here. The principles animating that recommendation include the need to account for the serious and devastating nature of Braeger's offense, the need to ensure adequate deterrence, and the need to avoid unwarranted sentencing disparities.

### A. The Parties' Factual Disputes

Before turning to the arguments supporting the government's sentencing recommendation, it is worth addressing the overall nature of Braeger's objections to the PSR, in part because the Court will need to resolve those disputes pursuant to Rule 32(i)(3)(B). *See United States v. Brown*, 716 F.3d 988, 994-96 (7th Cir. 2003). As the Court knows, the standard of proof for facts supporting a sentence is preponderance of the evidence. *United States v. Whitt*, 2 Fed. Appx. 541, 543 (7th Cir. 2001) (citing *Edwards v.*

*United States*, 523 U.S. 511 (1998)); *United States v. Shannon*, 518 F. 3d 494, 496 (7th Cir. 2008) (noting that the Seventh Circuit has repeatedly held that facts found by a preponderance of the evidence can be used to calculate a sentence, and even increase the Guidelines range).

The government has already submitted a substantial response to Braeger's objections, but it addresses them again here wholistically because Braeger's objections appear aimed at substantially minimizing the fraud he committed. For example, Braeger disputes that most of the representations he made to investors were false. And he argues that much of the $2.5 million in restitution calculated by giving him the benefit of the doubt for the money he loaned to Onyx was not fraud, but legitimate investment. Indeed, one could read Braeger's objections as implying that he misappropriated only a small amount of money and that he made only minimal misrepresentations. That would, however, be false. And to the extent that Braeger intends to minimize his fraud in that way, the government would argue that he significantly undercuts a true acceptance of responsibility here.

To evaluate the real scope of Braeger's fraud, it is worth starting with his admissions in the plea agreement. There, among other things, Braeger agreed that *his fraud* caused more than $1.5 million in loss. Moreover, the way the restitution was calculated matters here. It was determined by taking the $5.4 million that investors gave Braeger for Blue Star and IEF and subtracting the amount that Braeger loaned to Onyx. The reason to subtract money given to Onyx is because that is what Braeger told investors he'd do. As such, even though investors ultimately lost basically *all* the money they gave

3

Braeger, it was fair to credit the money he spent as he said he would as not the proceeds of fraud.

Yet Braeger's objections to the PSR now assert that hundreds of thousands of dollars he spent on things like a restaurant and cryptocurrency should nevertheless be viewed as "legitimate" expenditures of investor funds. Braeger points to hyper technical language in the PPM giving the General Partners broad discretion as legitimizing his restaurant and cryptocurrency purchases. In doing so though, Braeger ignores the forest for the trees. The PPM also told his victims that *virtually all* their money would be loaned to Onyx. And Braeger repeatedly and consistently talked about his experience in the auto industry, how the funds were based on vehicle VINs, and why investing in car dealerships was such a great idea. In fact, at one point in late September 2018 (*after* he purchased the restaurant), Braeger told investors he was going to change the fund name to incorporate "Onyx" because that would more closely track the "purpose of our company and growth goals". (Exh. 1).

Indeed, Braeger sent his victims a myriad of emails update emails about the fund. He talked about Onyx and the auto industry, but he never once mentioned restaurants, much less the nearly $1 million of victim funds he spent buying one. *Id.* (containing a sample of the kinds of update emails Braeger routinely sent). Of course, it stands to reason, then, that when the scheme fell apart, investors were surprised to learn that their money was invested in a restaurant. (Exh. 2). And when Braeger responded to such expressions of surprise he did so not by defending the restaurant as contemplated by the PPM, but rather by deflecting: "I am named as a defendant in a lawsuit for the restaurant

4

personally, and with a company I use for my art as well!! Any was [sic] named and is not surprising in a lawsuit when someone is trying to get money. The suit is also being dismissed by stipulation." (Exh. 3). The investors' reaction and Braeger's deflections demonstrate the absurdity of his attempt to now claim that buying a restaurant was a legitimate use of investor money.

If Braeger truly believed that buying a restaurant was a legitimate use of Blue Star investment funds, he would have mentioned it in one of his many updates or defended it after the scheme fell apart. He did neither. Coupled with his innumerable representations about how Blue Star's singular purpose was to invest in Onyx and the auto industry, it is evident that a preponderance of the evidence supports that Braeger misappropriated victim funds when he bought the Silver Spring House.

Braeger's ex-post facto attempt to legitimize his use of victim funds to buy cryptocurrency is similarly unpersuasive. Like the restaurant, Braeger never told his victims he was using their money to purchase of significant sums of cryptocurrency. Indeed, even the fund manager he hired raised concerns about the "major change in the scope of work" caused by Braeger's decision to engage in "trading crypto in earnest." (Exh. 4). In response Braeger wrote that he only intended to "put a little money in these to see if there may be a big 'winner' someday." *Id.* These communications demonstrate both that trading in cryptocurrency was not initially contemplated *and* that Braeger was not simply using cryptocurrency as "cash alternative" holdings. He was gambling with his victims' money.

Ultimately the gulf between what Braeger said to investors then, and his claims now is enormous. That gulf undermines the blatant attempt to reduce his culpability or the scope of his fraud.[2] And his objections should be denied. Moreover, to the extent Braeger's objections are meant to minimize the severity of the fraud he committed, such a minimization severely undercuts a true sense of remorse and acceptance of responsibility.

B. **Nature and Circumstances of the Offense**

Over the course of just over one year, Braeger managed to convince 27 people to give him a whopping $5.4 million. (PSR ¶ 16). Braeger got that money under the guise of being an experienced financial investor with significant personal experience, and family history, in the automobile industry. (Exh. 5) ("The business model has shown complete validation over a number of years *based on the success of the General Partner's 97 year old family business* and the General Partner's personal automobile finance business which is now over 6 years old and has never missed a payment on interest or principal to any investor."); (Exh. 6) ("the word 'subprime' although not a word of 'risk' to me with a 95 year family dealership background…."); (Exh. 1).

Braeger generated flashy PowerPoint presentations and private placement memoranda that gave his scheme an air of legitimacy and encouraged his victims to trust him. Braeger was, in other words, a good salesman. He told people what they wanted to hear, bragged about his family's wealth and experience, and sold victims a dream of

---

[2] Braeger also disputes his representations about the Dallas Cowboys. An affidavit from that Organization is more than sufficient to prove by a preponderance that those representations were made up.

extensive returns. The reality was, of course, different. Braeger lied and stole. He lied to victims. He lied to the people he hired to "manage" the accounting. (PSR ¶ 21). And he lied to his general partner. (Exh. 7).

Braeger's web of lies was profitable. Braeger had no other job during the relevant period – he lived off the money he obtained from his victims. And the fraud he perpetrated caused immeasurable damage.[3] That damage included being unable to fully support their families through cancer diagnoses (C&M.J.); "significant financial, marital and emotional hardships" (R&L.G.); a loss of "trust and faith" (KWR); "mental anguish" and "sleepless nights" (L.W.); an inability to pay for college (C.M.); and loss of "trust in others" as well as "stress and interrupted sleep" (J.P.).

Braeger caused these harms not only by committing the initial fraud, but also by the way he responded after the fraud unraveled. Several victims described bullying, harassment, and guilt trips they endured. One noted: "In addition to the financial loss, we suffered months of abusive, yelling, bullying phone conversations, lies and fraudulent documents from Braeger to hide his money trail and delay discovery. The emotional experience was deliberately painful and frustrating." (C.W.). Another described how Braeger called her several times while she was dealing with her cancer diagnosis, "begging and once he was sobbing and sounded drunk asking my help in guiding those who had 'turned against him' back to a good place." (C&M.J.). These victims' accounts comport with emails Braeger sent to victims after the fraud. In these emails, he criticized

---

[3] The government believes that these victim impact statements were provided to USPO and will be provided to the Court as part of the PSR. As such, the government is not filing them with this memorandum in order to protect the victims' identification.

7

victims for reporting his conduct to regulatory authorities (Exh. 8) and criticized "partners" for being "aggressive," threatening that such conduct could put "the partnership in a bit of peril that could worsen" (Exh. 9).

The fact that Braeger treated his victims in this way after the fraud, and that he took so long to acknowledge the pain he caused them is important. Investment fraud schemes like the one Braeger perpetrated here are particularly insidious because of the mental anguish they add to the significant financial harm they cause. These emotional consequences can often outlast even severe financial impacts, and they make for very difficult recoveries for these innocent victims.

Braeger's crime was extensive and significant. He stole over $2.5 million in a relatively short period of time from over two dozen people. He did it for what appears to be nothing more than greed and a desire for status. And he caused real and substantial harm to innocent people who he continued to gaslight and harm *after* his fraud unraveled. These facts make for an extremely aggravated offense that calls out for a significant period of incarceration.

C. **History and Characteristics of the Defendant**

Braeger has one criminal history point, and a criminal history category of one. But this is not the first time Braeger has been accused of defrauding investors or misappropriating client funds. (PSR ¶¶ 14, 15). Indeed, in December 2017, FINRA issued a finding that Braeger "misused and converted funds that had been given to him by his customers for investment." *Id.* at ¶ 14, Exh. A. Braeger appealed, and an independent review affirmed the findings in a 22-page opinion. That opinion recounts how Braeger

8

received $30,000 for an investment in "Rubicon," how he repeatedly sent false statements valuing that investment when the reality was he had transferred the $30,000 into an account that he controlled, and how he later sued those victims for defamation and tried to get them to agree not to testify in the FINRA proceeding as part of a settlement.[4] *Id.* at pp. 7-10. After a hearing that included over 170 exhibits and witness testimony, FINRA found that "for a period of more than five years, Braeger made numerous written and oral misrepresentations to SE and TH about the value of their investment and the reasons why they could not recover their funds." *Id.* at 10.

The conduct described in the FINRA order is eerily similar to Braeger's conduct in the instant case. And it is echoed in another order by the Wisconsin Department of Financial Institutions, which found that Braeger engaged in another multi-million-dollar fraud scheme involving Braeger Auto Finance. (PSR ¶ 15, Exhibit B).

These prior proceedings against Braeger speak volumes about his history and characteristics. And they demonstrate that what Braeger did here was not likely a one-off mistake. Indeed, this prior behavior certainly suggests that Braeger's criminal history score might underrepresent "the likelihood that the defendant will commit other crimes ..." U.S.S.G. §§ 4A1.3(a)(1), (2)(C) (referencing "[p]rior similar misconduct").

Braeger's post-Blue Star conduct gives even more reason to be concerned about that. Indeed, after Braeger's indictment in the instant case, the government learned that Braeger registered two new companies in 2020 and 2021: Terrapin Funding LLC and

---

[4] Apparently, they declined to so agree, and Braeger ended paying them.

Pantera Feeder Fund LLC. (Exh. 10 at ¶ 15). Braeger then met with two at least two individuals whom he convinced to "invest" with him. One gave Braeger $11,000 to invest in Pantera Capital. *Id.* at ¶ 16. But Braeger did not invest the money. Instead, he transferred $6,000 of that money to another account he controlled and used it for personal expenses. *Id.* Braeger also convinced a second person to invest in cryptocurrency. *Id.* at ¶ 22-23. But instead of buying cryptocurrency as promised, Braeger used the second person's money to pay for his utilities, food, gas, and to make an $8,000 payment to the first person. Of course, none of these facts have been proven beyond a reasonable doubt, and the government does not raise these facts to create a minitrial about them. But a review of the bank statements and interviews with these individuals form the basis of a sworn affidavit submitted by a law enforcement agent in support of a search warrant. Such facts are, therefore, properly considered as part of Braeger's history and characteristics, and in fashioning a sentence that provides adequate specific deterrence.

There are, of course, some mitigating factors that support the government's below-guidelines recommendation. For instance, Braeger pleaded guilty well before his victims would have had to prepare for a trial. Although it took several years, he ultimately spared his victims the additional trauma of a trial. That fact supports credit for acceptance of responsibility. At the same time, however, Braeger has not submitted any statement accepting responsibility or apologizing to his victims. And his objections certainly imply a deflection, rather than acceptance, of responsibility. Moreover, Braeger has not made any efforts, over the past *three years*, to earn or save money to try to make his victims whole.

Finally, though Braeger suffered through some difficulties like divorce and a strained relationship with his parents, he grew up privileged with strong support from family and mentors. (PSR ¶¶ 56-58, 62). He raised two children and has engaged in positive relationships. These can be mitigating factors in that they show that Braeger has a support system and background to be a law-abiding citizen upon his release.

At the same time, nothing about Braeger's upbringing can explain why he stole from so many innocent people. Indeed, Braeger's only mental health issue is the depression he has been under care for since the age of 14, and he has no substance abuse or addiction issues. *Id.* at ¶¶ 78, 81-82. Moreover, Braeger graduated from college and graduate school, and is a certified life coach. *Id.* at ¶¶ 83-85. As such, it seems clear that Braeger could easily have been a successful and productive member of the community. Instead, he took advantage of people and ruined their lives.

Braeger's background differentiates him from many of the individuals who appear before the Court, many of whom often commit crimes to feed a drug or gambling habit, or due to other devastating circumstances. Unlike those individuals, it is evident that self-aggrandizement and greed motivated Braeger. Ultimately, he made the choice to live off other people's hard-earned money, and that decision warrants a significant period of incarceration.

D. **The Public's Interest and Deterrence**

Braeger's case is somewhat unique among the crimes this Court sees in another way. In many so-called white-collar cases, offenses come before this Court with official or government victims, or when the defendant is merely one of a number of players in a

11

larger fraud. In such cases, like those involving tax fraud or theft of government funds, the harms are of course, serious in their own right because of how they impact the broader community. But cases with institutional victims, or those in which the defendant's role is somewhat ancillary to the overall conduct, can sometimes present with sentencing guidelines that overstate the nature of the offense. *See, e.g.*, *United States v. Burns*, 2019 CR 242 (Adelman, J.); *U.S. v. Redemann*, 295 F. Supp. 2d 887, 899 (E.D. Wis. 2003) (Adelman, J.); *United States v. Thomas*, 595 F. Supp. 2d 949, 951-52 (E.D. Wis. 2009) (Adelman, J.).

Indeed, here, the government is recommending a below-guidelines sentence because the defendant did invest some of the victims' money and did not use their money to live extravagantly. But a significant sentence is nonetheless required because there is something particularly more devastating about a case in which someone with Braeger's gifts and abilities brazenly takes advantage of real people and causes substantial personal harm. *See e.g.*, *United States v. Ramer*, 2013 WL 6158025, *3 (E.D. Wis. 2013) (Adelman, J.) (sentencing defendant who stole just over $1,000,000, but did not use the funds to live lavishly, to 42 months' imprisonment in part due to the nature of, and impact on, the victims). The crime is made even more odious when the perpetrator, like Braeger here, engages in it merely to aggrandize his standing in the community and live off other people's money.

That is why a significant sentence is warranted. It is warranted to ensure punishment and promote respect for the law. But it is also necessary to send a message, both to Braeger and to others like him, who might believe that engaging in this kind of fraud pays off and risks only a slap-on-the-wrist. Indeed, this this Court has often

12

Case 2:21-cr-00233-LA     Filed 12/09/24     Page 12 of 15     Document 71

recognized that the concept of "general deterrence may be more of a factor in white collar cases, where at least some of the people tempted to commit such crimes are rational actors who would be dissuaded by the prospect of prison." *United States v. Goss*, 325 F. Supp. 3d 932, 935 (E.D. Wis. 2018). The Seventh Circuit has also "endorsed the idea that white-collar criminals 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)). Those concepts matter here.

First, the public should know that defrauding innocent people will lead to significant punishment. And second, Braeger himself needs to be deterred given his history and his conduct here.

### E. Other 18 U.S.C. § 3553(a) Factors

Section 3553(a) ultimately tells this Court to consider the facts above and formulate a sentence that will be sufficient, but not greater than necessary, to reflect the seriousness of the crime, promote respect for the law, provide just punishment, afford deterrence, and protect the public. The Guidelines in this case are driven by the high loss amount and the large number of victims. The Guidelines call for a sentence of between 41-51 months' incarceration.

The government's recommendation of 30 months' incarceration is substantially below the low-end of that range for a few reasons. First, Braeger pleaded guilty before any victims had to prepare for trial. Second, Braeger did try to invest a significant percentage of the victims' money as he said he would. And third, Braeger did not spend

13

all the money to fund a lavish lifestyle. Thus, a sentence of 30 months' incarceration appropriately factors in the aggravating and mitigating factors at play here.

Moreover, a sentence of 30 months' incarceration avoids unnecessary sentencing disparities and falls in line with sentences in white-collar criminal cases issued in this district. For example, this Court recently sentenced Charles Lawrence, to 54 months' incarceration for perpetrating an investment fraud that resulted in a larger loss amount and significantly more extravagant spending. Given those differences, a 24-month longer sentence for Mr. Lawrence than Mr. Braeger makes sense. Closer to Braeger's case appears to be the *Ramer* case, cited above, in which this Court sentenced the defendant to 42 months' incarceration. Though Ramer's loss amount was lower than Braeger's, it did not appear that he invested quite as much as Braeger in a way consistent with his representations, making the additional year of incarceration sensible. Another data point in this district is *United States v. Arrington*, 21-CR-63, where the defendant committed an investment fraud causing approximately $2 million in loss and received a sentence of 33 months' incarceration. And at the lower end of the spectrum sits *United States v. Lenzen*, 24-CR-90. In that case, the defendant received a sentence of 18 months' incarceration on two misdemeanor counts of willful failure to pay taxes. Given that Braeger's case involves a felony conviction, an extensive fraud, and significant impact on real innocent individuals, a sentence quite substantially longer than 18 months is required here.

For those reasons, and the information provided in this memorandum, the Government submits that a sentence of 30 months is sufficient, but not greater than necessary, to achieve the ends of Section 3553(a).

14

Respectfully submitted this 9th day of December, 2024, at Milwaukee, Wisconsin.

                                  GREGORY J. HAANSTAD
                                  United States Attorney

                    By:    /s/ *Julie F. Stewart*

                                  JULIE F. STEWART
                                  Assistant United States Attorney
                                  United States Attorney's Office